**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| MICHELLE RENA BUKETT, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | CASE NO. 6:20-CV-00587-JCB-KNM |
| KILOLO KIJAKAZI, | § | |
| COMMISSIONER, SOCIAL | § | |
| SECURITY ADMINISTRATION | § | |
| | § | |
| *Defendant.* | | |

**REPORT & RECOMMENDATION OF**
**THE UNITED STATES MAGISTRATE JUDGE**

Plaintiff initiated this lawsuit by filing a complaint seeking judicial review of the Commissioner's decision denying her application for Social Security benefits. The matter was referred to the undersigned for findings of fact, conclusions of law and recommendations for the disposition of the matter pursuant to 28 U.S.C. § 636(b)(1). Having considered Plaintiff's brief (Doc. No. 16), and the Commissioner's responsive brief (Doc. No. 17), the undersigned recommends that the Commissioner's final decision be **AFFIRMED** and that the above-styled lawsuit be **DISMISSED WITH PREJUDICE**.

**PROCEDURAL HISTORY**

Plaintiff filed an application for supplemental security income on October 15, 2018, alleging a disability beginning on August 9, 2018. The application was denied on February 20, 2019, and again on reconsideration on May 24, 2019. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). The ALJ conducted a telephonic hearing on April 27, 2020, and issued an unfavorable decision on May 18, 2020. Plaintiff sought review from the Appeals Council. The Appeals Council denied the request for review on August 31, 2020. As a result, the

1

ALJ's decision became that of the Commissioner. Plaintiff then filed this lawsuit on November 4, 2020, seeking judicial review of the Commissioner's decision.

## LEGAL STANDARD

Title II of the Act provides for federal disability insurance benefits.  Title XVI of the Act provides for supplemental security income for the disabled.  The relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1983); *Rivers v. Schweiker*, 684 F.2d 1144, 1146, n. 2 (5th Cir. 1982); *Strickland v. Harris*, 615 F.2d 1103, 1105 (5th Cir. 1980).

Judicial review of the denial of disability benefits under section 205(g) of the Act, 42 U.S.C. § 405(g), is limited to "determining whether the decision is supported by substantial evidence in the record and whether the proper legal standards were used in evaluating the evidence." *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994) (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990)); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991) (per curiam). A finding of no substantial evidence is appropriate only where there is a conspicuous absence of credible choices or no contrary medical evidence.  *Johnson v. Bowen*, 864 F.2d 340, 343–44 (5th Cir. 1988) (citing *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).  Accordingly, the Court "may not reweigh the evidence in the record, nor try the issues *de novo*, nor substitute [the Court's] judgment for the [Commissioner's], even if the evidence preponderates against the [Commissioner's] decision."  *Bowling*, 36 F.3d at 435 (quoting *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988)); *see Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993); *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992); *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985).  Rather, conflicts in the evidence are for the Commissioner to decide.  *Spellman*, 1 F.3d at 360 (citing

*Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990)); *Anthony*, 954 F.2d at 295 (citing *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983)).  A decision on the ultimate issue of whether a claimant is disabled, as defined in the Act, rests with the Commissioner.  *Newton v. Apfel*, 209 F.3d 448, 455–56 (5th Cir. 2000); Social Security Ruling ("SSR") 96-5p.

"Substantial evidence is more than a scintilla but less than a preponderance—that is, enough that a reasonable mind would judge it sufficient to support the decision." *Pena v. Astrue*, 271 Fed. Appx. 382, 383 (5th Cir. 2003) (citing *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994)).  Substantial evidence includes four factors: (1) objective medical facts or clinical findings; (2) diagnoses of examining physicians; (3) subjective evidence of pain and disability; and (4) the plaintiff's age, education, and work history.  *Fraga v. Bowen*, 810 F.2d 1296, 1302 n. 4 (5th Cir. 1987).  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.  *Richardson v. Perales*, 402 U.S. 389, 390, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).  However, the Court must do more than "rubber stamp" the Administrative Law Judge's decision; the Court must "scrutinize the record and take into account whatever fairly detracts from the substantiality of evidence supporting the [Commissioner's] findings." *Cook*, 750 F.2d at 393 (5th Cir. 1985).  The Court may remand for additional evidence if substantial evidence is lacking or "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  42 U.S.C. § 405(g); *Latham v. Shalala*, 36 F.3d 482, 483 (5th Cir. 1994).

A claimant for disability has the burden of proving a disability.  *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).  The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less

3

than 12 months." 42 U.S.C. §§ 416(i)(1)(A) and 423(d)(1)(A). A "physical or mental impairment" is an anatomical, physiological, or psychological abnormality which is demonstrable by acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

In order to determine whether a claimant is disabled, the Commissioner must utilize a five–step sequential process. *Villa*, 895 F.2d 1022. A finding of "disabled" or "not disabled" at any step of the sequential process ends the inquiry. *Id.*; see *Bowling*, 36 F.3d at 435 (citing *Harrell*, 862 F.2d at 475). Under the five–step sequential analysis, the Commissioner must determine at Step One whether the claimant is currently engaged in substantial gainful activity. At Step Two, the Commissioner must determine whether one or more of the claimant's impairments are severe. At Step Three, the commissioner must determine whether the claimant has an impairment or combination of impairments that meet or equal one of the listings in Appendix I. Prior to moving to Step Four, the Commissioner must determine the claimant's Residual Functional Capacity ("RFC"), or the most that the claimant can do given his impairments, both severe and non–severe. Then, at Step Four, the Commissioner must determine whether the claimant is capable of performing his past relevant work. Finally, at Step Five, the Commissioner must determine whether the claimant can perform other work available in the local or national economy. 20 C.F.R. §§ 404.1520(b)–(f). An affirmative answer at Step One or a negative answer at Steps Two, Four, or Five results in a finding of "not disabled." *See Villa*, 895 F.2d at 1022. An affirmative answer at Step Three, or an affirmative answer at Steps Four and Five, creates a presumption of disability. *Id*. To obtain Title II disability benefits, a plaintiff must show that he was disabled on or before the last day of his insured status. *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981), *cert denied*, 455 U.S. 912, 102 S.Ct. 1263, 71 L.Ed.2d 452 (1982). The burden of proof is on the claimant for the first four steps, but shifts to the Commissioner at Step Five if the claimant shows that he cannot

perform his past relevant work. *Anderson v. Sullivan*, 887 F.2d 630, 632–33 (5th Cir. 1989) (per curiam).

The procedure for evaluating a mental impairment is set forth in 20 CFR §§ 404.1520a and 416.920a (the "special technique" for assessing mental impairments, supplementing the five-step sequential analysis). First, the ALJ must determine the presence or absence of certain medical findings relevant to the ability to work. 20 CFR §§ 404.1520a(b)(1), 416.920a(b)(1). Second, when the claimant establishes these medical findings, the ALJ must rate the degree of functional loss resulting from the impairment by considering four areas of function: (a) activities of daily living; (b) social functioning; (c) concentration, persistence, or pace; and (d) episodes of decompensation. 20 CFR §§ 404.1520a(c)(2–4), 416.920a(c)(2–4). Third, after rating the degree of loss, the ALJ must determine whether the claimant has a severe mental impairment. 20 CFR §§ 404.1520a(d), 416.920a(d). If the ALJ's assessment is "none" or "mild" in the first three areas of function, and is "none" in the fourth area of function, the claimant's mental impairment is "not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities." 20 CFR §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, when a mental impairment is found to be severe, the ALJ must determine if it meets or equals a Listing. 20 CFR §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if a Listing is not met, the ALJ must then perform a residual functional capacity assessment, and the ALJ's decision "must incorporate the pertinent findings and conclusions" regarding the claimant's mental impairment, including "a specific finding as to the degree of limitation in each of the functional areas described in [§§ 404.1520a(c)(3), 416.920a(c)(3)]." 20 CFR §§ 404.1520a(d)(3) and (e)(2), 416.920a(d)(3) and (e)(2).

**ALJ'S FINDINGS**

The ALJ made the following findings in his May 18, 2020 decision:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.

2. The claimant has not engaged in substantial gainful activity since August 9, 2018, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: lumbar degenerative disc disease status post microdiscectomy, degenerative disc disease of the cervical spine status post fusion, and chronic kidney disease status post kidney transplant (20 CFR 404.1520(c)).

4. The claimant does not have impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. The claimant has the residual functional capacity to preform light work as defined in 20 CFR 404.1567(b) except she can occasionally stoop and crouch and occasionally reach overhead with the bilateral upper extremities.

6. The claimant is capable of preforming past relevant work as an office nurse. This work does not require the performance of work-related activities precluded by the claimants residual functional capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from August 9, 2018, through the date of this decision (20 CFR 404.1520(f)).

**ADMINISTRATIVE RECORD**

*Administrative Hearing*

Plaintiff testified at her hearing before the ALJ on April 27, 2020. Plaintiff testified that she previously worked as a Licensed Vocational Nurse ("LVN") and Registered Nurse ("RN"). Plaintiff testified that she has previously seen a counselor and takes Prozac for depression. Plaintiff explained that she's had trouble getting new counseling appointments due to COVID-19 limitations. She asserted that she has difficulty sleeping but a CPAP machine has sometimes helped

provided more restful sleep. Plaintiff stated that she still suffered from daytime drowsiness and severe fatigue, which causes her to have difficulty concentrating. Specifically, Plaintiff testified that she is often unable to remember conversations and loses track of time. Plaintiff explained that she sometimes forgets to take her morning medication, despite having a pill box system to remind her. Plaintiff also stated that her depression and problems with concentration have worsened since her son's death. Plaintiff testified that she can drive a vehicle, dress herself, and assist her husband with some light housework and meal preparation.

Concerning her physical symptoms, Plaintiff testified that she experiences headaches, fatigue, stomach problems, bowel problems, and blood sugar fluctuations as side effects from the medications she takes for her kidney transplant. Plaintiff explained that she had throbbing headache pain daily, and that two-three days per week the pain caused her to have to lay down on the couch. Plaintiff stated that she also has daily nausea that results in vomiting a few times a month. Plaintiff stated that she is either extremely constipated or has diarrhea, and estimates that she has urgent episodes of diarrhea weekly. Plaintiff also stated that she has vertigo which began about two years ago. She explained that it affects her when she stands from a sitting position and that she has fallen a few times as a result. Plaintiff stated that her back pain flares up on a daily basis. She stated that as a result of the back pain, she can only lift a gallon of milk and estimated that she can only stand for approximately 70 minutes at a time and sit for an hour at a time.

A vocational expert, Jacqueline Crawford, also testified at the hearing. Ms. Crawford classified Plaintiff's past work as: (1) general duty nurse, DOT 075.364-010, SVP 7, medium to very heavy as performed because of the push/pull; and (2) office nurse, DOT 075.375-014, light as generally performed and actually performed. The ALJ presented Ms. Crawford a hypothetical of an individual with Plaintiff's age, education, and work experience who can perform light work

with occasional stooping, crouching, and reaching overhead with the bilateral upper extremities. Ms. Crawford testified that the hypothetical individual could perform Plaintiff's past work as an office nurse. Ms. Crawford also identified the following jobs at the light, unskilled level that the hypothetical individual could perform: (1) Marker, DOT 209.587-034, light, with 218,900 jobs in the national economy; (2) Storage facility rental clerk, DOT 295.367-026, SVP 2, light, with 84,500 jobs in the national economy; and (3) blood doner unit assistant, DOT 245.367-014, SVP 2, light, with 77,000 jobs in the national economy. Regarding the recommended jobs, when asked if her testimony was consistent with the Dictionary of Occupational Titles, Ms. Crawford stated that there was a conflict with the "occasional overhead reaching" in the DOT for light jobs, which includes "frequent reaching in all directions," and stated that she used her training, education, and work experience to reconcile the difference.

The ALJ modified the hypothetical to add that the individual would be absent, late, or must leave work early on average once per week on a regular and continuing basis. Ms. Crawford testified that the individual could not return to Plaintiff's past work and would be unable to maintain employment for either skilled or unskilled work. Likewise, Ms. Crawford testified that there are no transferable skills if the hypothetical is changed to sedentary work.

*Medical Record*

Plaintiff alleges a disability onset date of August 9, 2018. Plaintiff has a past medical history significant for diabetes mellitus type 2, obstructive sleep apnea, hypertension, hypercholerolemia, gastroesophageal reflux disease, diverticulitis, asthma, IgA nephropathy status post renal transplant, as well as a C5-6 fusion. On February 2, 2016, Plaintiff contacted the Christus Trinity Douglas Clinic to establish care with Dr. James Stanford, due to her history of gastric polyps. (Bates stamp p. 598). Dr. Stanford instructed her to continue taking omeprazole for

indigestion and gave her a referral to Dr. Duvall for a repeat upper gastrointestinal endoscopy. The findings from Plaintiff's upper GI endoscopy showed delayed gastric emptying without gastric polyps.[1] Plaintiff was prescribed Reglan.

On February 18, 2016, Plaintiff saw Dr. Andrew Berkson for a follow up visit, complaining of medial low lumbar pain which spread bilaterally into her buttocks. Plaintiff stated that the pain worsened with sitting or motion, and that it improved if she laid supine and with heat. Plaintiff stated that Tylenol 3 provided mild relief and rated her pain between 3/10 at its best and 8/10 at its worst. On examination, Plaintiff exhibited normal range of motion and appropriate mood and affect. Plaintiff's physical examination showed positive straight leg raises with diffuse changes in light touch sensation in L4, L5, and S1 dermatomal distributions.[2] Dr. Berkson reviewed the April 7, 2015, MRI of Plaintiff's lumbar spine, and noted facet arthropathy at L2-3, annular tear in the posterior fibers along with facet arthropathy at L3-4, an annular tear in the posterior fibers along with facet arthropathy at L4-5, and facet arthropathy at L5-S1. Dr. Berkson discussed ordering additional imaging, which Plaintiff resisted. Dr. Berkson gave Plaintiff prescription for Tylenol No. 4 and Zanaflex with instructions to stop taking Flexeril.

Plaintiff presented at Trinity Mother Francis Emergency Care Center, complaining of chronic back pain on February 21, 2016, and was seen by Dr. Roy Morrison, DO. On examination, Plaintiff had a normal mood and affect with normal behavior and Plaintiff exhibited a normal range of motion without edema. The record also reflects Plaintiff had a positive straight L leg raise and tenderness to palpation over her L piriformis muscle.[3] Dr. Morrison reviewed Plaintiff's MRI from March 10, 2015, noted that it showed degenerative findings, diagnosed Plaintiff with Sciatica, and

---

[1] Bates stamp p. 519.
[2] Bates stamp p. 425, 1255.
[3] Bates stamp p. 1138.

gave Plaintiff prescriptions for Valium and NORCO for her pain. Plaintiff was discharged the same day with instructions to follow up with her primary physician, Dr. Stanford.[4]

On August 4, 2016, Plaintiff had a follow up visit with Dr. Berkson. Plaintiff presented complaining of continuing lumbar pain that ranged from 8/10 at its worst to 3/10 at its best. Plaintiff stated that her pain was worse when transitioning from sit-to-stand and with twisting or activities such as vacuuming. Dr. Berkson noted appropriate mood and affect, and discussed the possibility of facet injections versus an epidural injection. Dr. Berkson reviewed the results of Plaintiff's lumbar spine MRI dated February 23, 2016, and noted facet arthropathy at L1-2 and L2-3, along with mild disc desiccation at L3-4. The MRI also revealed an annular tear in the posterior fibers with facet arthropathy, and at L4-5, showed mild right anterolateral recess narrowing with some mild left anterolateral recess narrowing, though, not convincingly so; at L5-S1 I note facet arthropathy and a subtle hint of an annular tear.[5] The record also reflects that Plaintiff returned for a follow-up with Dr. Berkson on September 29, 2016 for back pain, and that Plaintiff received facet injections on September 1, 2016, bilaterally at the L3-4, L4-5, and L5-S1 levels with Dr. Dunn.[6]

On September 13, 2016, Plaintiff had a follow up appointment with Dr. Stanford and presented with swelling and tenderness to her left arm pit. Upon examination, Dr. Stanford noted bilateral axilla without palpable masses and mild glandular tissue medially at the three o'clock position on Plaintiff's left breast. Plaintiff was instructed to reduce her intake of caffeine and chocolates. When Plaintiff returned for a routine well women's physical on December 27, 2016, Plaintiff stated that she continued to have lower back pain with pain in her legs, and that she had

---

[4] Bates stamp p. 424.
[5] Bates stamp p. 1269, 1274.
[6] Bates stamp p. 1206, 1286.

been taking Tylenol #4 daily and a muscle relaxer as needed one to two times per week. Plaintiff's physical exam revealed no musculoskeletal tenderness or deformity and a normal mood and affect. The record also reflects Plaintiff's Depression Screening was a PHQ2 Total Score of 0. Dr. Stanford noted that Plaintiff had an abnormal BMI and discussed Plaintiff's current nutrition and physical activity behaviors.

Plaintiff presented at the Trinity Mother Francis Emergency Department on September 18, 2016, complaining of mild constant toe pain to the lateral left big toe with associated redness and tenderness. Dr. Martin Baum diagnosed Plaintiff with an ingrown toenail, performed a wedge incision to treat it, and discharged Plaintiff with a prescription for NORCO. Dr. Baum also noted Plaintiff had normal mood and affect with normal behavior. On December 27, 2016, Plaintiff saw Dr. Stanford for her annual well women's exam. Plaintiff complained of ongoing lower back pain with pain in her legs, and reported taking Tylenol #4 daily and half of a muscle relaxer one-to-two times per week, as needed. Dr. Stanford noted no abnormalities with her physical exam, but noted Plaintiff's abnormal BMI discussed her current nutrition and physical activity behaviors. The record also reflects that Plaintiff's depression screening PHQ2 Total Score was 0.

On April 25, 2017, Plaintiff had a follow-up visit with Dr. Berkson. Plaintiff complained of ongoing left-sided lumbar and left lower extremity pain, which Plaintiff described as stabbing pain with radiation into her lower left extremity. Plaintiff stated her pain was worse with prolonged sitting or standing, but gets better with massage and stretching as well as with Tylenol #4. Plaintiff also stated that since her last visit on September 20, 2016, that she was "better." Dr. Berkson noted Plaintiff had appropriate mood and affect. Plaintiff's physical examination showed positive straight leg raising on her left. Dr. Berkson gave Plaintiff a refill for Tylenol #4, discussed a trial

of Cymbalta, the possibility of EMG and nerve conducting studies, and the possibility of an updated lumbar spine MRI. Plaintiff said she would consider the above.[7]

Plaintiff returned to the Douglas Clinic, complaining of gastroesophageal reflux, morning stiffness and back pain, and was treated by Machelle McDowell, FNP-C on June 20, 2017. A review of Plaintiff's symptoms was negative for anxiety or depression, and a physical examination revealed no abnormalities. FNP-C McDowell diagnosed Plaintiff with gastroesophageal reflux disease, gastroparesis, regurgitation, and irritable bowel syndrome with both constipation and diarrhea. Plaintiff was instructed to continue pantoprazole and to take Reglan and use Gaviscon liquid as needed. Plaintiff was given a trial of dicyclomine for abdominal pain/bloating and instructed to follow up with the GI clinic in one year.[8]

On July 6, 2017, Plaintiff saw Dr. Stanford complaining of vaginal discomfort. Plaintiff stated that she was experiencing on-going pressure that had lasted for several weeks. Plaintiff stated that she checked her blood sugars periodically, but did not remember the last time she had taken it. A physical exam showed no abnormalities, and Dr. Stanford noted that Plaintiff had normal mood and affect, normal behavior, and normal cognition and memory. The record reflects that Plaintiff had an abnormal BMI and elevated tg levels, and Dr. Stanford also noted Plaintiff needed to adjust her diet given her diagnosis for hypercholesteremia and type 2 diabetes mellitus.

On January 23, 2018, Plaintiff presented at the Parker Health and Chiropractic Clinic, complaining of pain in the lower back with radiation. Dr. Travis Parker attended to Plaintiff and ordered two X-Rays: anterior to posterior and lateral views of her thoracic, cervical, and lumbar spine. Dr. Parker diagnosed Plaintiff with cervicobrachial syndrome, intervertebral disc disorders with radiculopathy in the thoracolumbar region, segmental and somatic dysfunction of upper

---

[7] Bates stamp p. 1313.
[8] Bates stamp p. 398, 523.

extremity, and intervertebral disc disorders with radiculopathy in the lumbosacral region. Plaintiff returned two days later, complaining of worsening pain and decreased range of motion. Dr. Parker performed chiropractic manipulation of the spine, applied intersegmental mechanical traction, and performed chiropractic extremity manipulation. Plaintiff sought treatment from Dr. Parker on ten additional occasions, the last of which was April 3, 2018. At each visit, Dr. Parker provided chiropractic care without any additional diagnosis.[9]

Plaintiff returned to the Douglas Clinic, on April 2, 2018, complaining of elevated blood pressure and reported she had been experiencing intermittent dizziness, headaches, and fatigue along with a feeling of pressure in her head. Plaintiff stated that she took Claritin daily, and that after a similar episode in October, she began taking Flonase which helped. A review of Plaintiff's symptoms was negative for musculoskeletal back or neck pain and negative for nervous or anxious feelings. On examination, Melissa Whitus, FNP-C noted that Plaintiff had a normal range of motion, no edema, and a normal mood and affect. Plaintiff was diagnosed with hypertension, intrinsic asthma, acute intractable headache, unspecified, dizziness, and acute fontal sinusitis with unspecified reoccurrence. Plaintiff was told to continue taking her current medications along with Flonase and Claritin daily, and was given a prescription for a ten-day course of Augmentin with instructions to follow up if her symptoms worsened or failed to improve.

On April 10, 2018, Plaintiff arrived at Trinity Mother Francis Hospital complaining of back and neck pain after a motor vehicle accident six days prior. Plaintiff stated that she tried acetaminophen for the pain, which provided no relief. Dr. Deborah Boyd examined Plaintiff and noted that she exhibited spinous process and muscular tenderness in her neck and bony tenderness in her thoracic back with a normal range of motion. A thoracic X-Ray revealed no acute findings,

---

[9] Bates stamp p. 1002.

and a cervical X-Ray showed a "narrowing of the C3-4, C4-C5 and minimally C6-C7 disc,"[10] as well as anterior and posterior spurring. The cervical X-Ray impression noted spondylosis and postop changes with no acute cervical abnormalities. Dr. Boyd diagnosed Plaintiff with acute thoracic back pain, unspecified back pain laterally, and gave Plaintiff a prescription for Flexeril.

On April 26, 2018, Plaintiff had a follow-up visit with Dr. Stanford, complaining of bilateral shoulder and arm pain that increased at night and stated that it had increased after the motor vehicle accident. Plaintiff also stated that she had been experiencing vertigo and headaches with nausea for the past five weeks. Upon examination, Dr. Stanford noted that Plaintiff developed vertigo in recumbent position and sitting up quickly, and noted that Plaintiff had a normal mood and affect, normal behavior, and that her cognition and memory were normal. The record also reflects Plaintiff's Depression Screening was a PHQ2 Total Score of 0. Dr. Stanford diagnosed Plaintiff with benign paroxysmal positional vertigo with unspecified laterality and gave her a prescription for meclizine with instructions to continue using a nasal steroid.[11] At a follow-up appointment four months later, Plaintiff presented with sciatica in her right buttock. Plaintiff stated it had recently developed after traveling. A physical exam showed positive results for right sided lower back pain and Dr. Stanford noted Plaintiff had a normal mood and affect. Dr. Stanford ordered lab work including a CBC, urinalysis, lipid, and a comprehensive metabolic panel, and instructed Plaintiff to follow up in 6 months.

Plaintiff had a follow-up appointment with Dr. Berkson on July 27, 2018, and presented with right-sided lumbar and right lower extremity pain. Plaintiff stated the pain began after she and her husband went camping and it had persisted for approximately two weeks. Plaintiff reported that the pain had decreased mildly since it began but that it continued to wax and wane ranging

---

[10] Bates stamp p. 1327.
[11] Bates stamp p. 811.

from 0/10–10/10. Plaintiff stated that it worsened with sitting and improved if she laid down or took medication. Dr. Berkson noted that Plaintiff's pain appeared to be radicular in etiology, and upon examination, Plaintiff had a very positive slump testing and straight leg raising bilaterally. Dr. Berkson discussed the possibility of a Medrol Dosepak, which Plaintiff refused given to her diabetes and recently elevated blood glucose levels. Accordingly, Dr. Berkson gave Plaintiff a prescription for Duloxetine for her radicular pain and gave Plaintiff instructions for appropriate stretches to be done at home twice per day on a daily basis. Finally, Dr. Berkson ordered an updated lumbar MRI "given [Plaintiff's] symptoms as well as her lack of response to conservative care[]."[12]

On August 14, 2018, Plaintiff had a follow up with Dr. Berkson to review the results of her lumbar spine MRI. Dr. Berkson did not yet have the radiologists report for review, but noted facet arthropathy at L2-3, a large annular tear at L3-4, mild disc desiccation along with facet arthropathy, a very mild right anterolateral recess narrowing secondary to a central disc bulge at L4-5 and facet arthropathy, and an annular tear in the posterior fibers at L5-S1. Dr. Berkson also noted a large central to right paracentral disc bulge, which he felt was contacting the right S1 nerve root in the anterolateral recess with facet arthropathy. Dr. Berkson also opined that there appeared to be some subtle contact of the right L5 nerve root in the anterolateral recess at the L4-5 level. Upon examination, Plaintiff had very positive slump testing and straight leg raising bilaterally. Dr. Berkson diagnosed Plaintiff with lumbar radiculopathy and herniated nucleus pulposus of the lumbar and gave Plaintiff a referral to see Dr. Dunn for a right S1-S2 transforaminal injection with instructions to follow up with him three weeks post injection.

---

[12] Administrative Record, Ex. 3F at *51 (Bates stamp p. 380).

On August 29, 2018, Plaintiff returned to the Douglas Clinic for a follow up with Dr. Stanford, complaining of a possible hernia. A physical exam revealed an area of tenderness in Plaintiff's lower left abdomen without abdominal wall defect, nodules, or swelling. Dr. Stanford opined the pain could be attributed to a mild hernia or tear of the fascia and instructed Plaintiff to call if she experienced any changing symptoms.

On September 11, 2018, Plaintiff returned for a follow-up with Dr. Berkson. Plaintiff stated that she was having difficulty sleeping and given her inability to tolerate Neurontin, Cymbalta, or Flexeril in the past, Dr. Berkson gave her a trial of amitriptyline at a low dose to be taken at night.[13] The record reflects that Plaintiff had very positive slump testing on examination and that her updated MRI demonstrated contact of the right S1 nerve root in the anterolateral recess at the L5-S1 level secondary to a large right paracentral disc bulge or herniation. Dr. Berkson noted that Plaintiff had a good initial response to her right S1-S2 transforaminal injection, but not good durability as her pain returned to baseline. Dr. Berkson gave Plaintiff a referral for a repeat right S1-S2 transforaminal injection and discussed the possibility of a neurosurgical consultation.

On September 25, 2018, Plaintiff presented at the Christus Trinity Clinic Neuroscience institute for a consultation with Dr. Nicholas Andrade. Plaintiff complained of persistent gluteal pain that worsened during the day, was aggravated by bending, and only mildly responsive to analgesics, NSAIDs, walking and muscle relaxants. Dr. Andrade noted that Plaintiff had a history of right leg radiculopathy in an S1 distribution with a right L5-S1 caudally migrated disc fragment, and noted that Plaintiff had received one epidural steroid injection and was scheduled to undergo another. Upon examination, Dr. Andrade found Plaintiff had a normal range of motion and noted that Plaintiff had a normal mood and affect. A review of Plaintiff's MRI showed a small L5-S1

---

[13] Bates stamp p. 2158.

caudally migrated disc fragment impinging on the right S1 nerve root, and L3-4, L4-5, and L5-S1 broad disc bulges without significant canal stenosis or neural compression. Dr. Andrade offered Plaintiff an L5-S1 microdiscectomy, which Plaintiff stated she would consider. On September 27, 2018, Plaintiff presented to the North Park Pain Procedure Center for her second spinal corticosteroid injection with Dr. Dunn.[14]

On October 2, 2018, Plaintiff presented at the Douglas Clinic complaining of severe reflux and was seen by Machelle McDowell, FNP-C. Plaintiff stated that she had been taking pantoprazole twice daily and had adhered to the lifestyle recommendations, but was still suffering from regurgitation after meals at night and most days a week. Plaintiff complained of severe epigastric pain that radiated through to her back, nausea without vomiting, and general malaise and fatigue. On examination, Plaintiff appeared to have a hard time sitting due to her abdominal and back pain, but the exam was otherwise unremarkable. Plaintiff's labs including CBC, LFTs, and lipase were all within normal limits except for a mildly elevated lipase of 420. An abdominal ultrasound revealed mild common bile duct dilation and possible minimal pancreatic ductal dilation. Plaintiff underwent a gastric emptying study which was negative for gastroparesis and gastric biopsies which revealed mild chronic inactive gastritis with reactive changes that were negative for H. pylori.[15] Plaintiff also underwent an MRI MRCP, the findings of which were unremarkable and revealed no biliary dilation, but did show severe bilateral renal atrophy.[16]

On October 25, 2018, Plaintiff saw by Dr. Duvall for an upper GI endoscopy ("EGD"). The record reflects the procedure was indicated due to Plaintiff's dysphagia, dyspepsia, and her lack of response to omeprazole or protonix with refractory pyrosis, retention of food during prior

---

[14] Bates stamp p. 1531.
[15] Bates stamp p. 545, 605–06.
[16] Bates stamp p. 1624.

EGDs, and intolerance to regalan and domperidone. The EGD revealed no evident endoscopic abnormality to explain Plaintiff's dysphagia. Dr. Duvall then dilated the esophagus and took biopsies of erythema in the gastric antrum, which showed mild chronic inactive gastritis and were negative for H. pylori, dysplasia, and malignancy.[17] Plaintiff was instructed to proceed with a trial of imipramine for non-ulcer dyspepsia and to follow up in one month.

On October 26, 2018, Plaintiff presented at Christus Trinity Mother Frances Hospital–Surgery for a Right L5-S1 microdiscectomy performed by Dr. Andrade.[18] Dr. Andrade identified and removed a small, caudally migrated free disc fragment. Two lateral post-operative examinations of the lumbar spine X-Rays were obtained, the first demonstrated a right opaque surgical S1 posterior the L5-S1 level and the second demonstrated the radiopaque surgical assessment posterior to the S1 vertebral body.[19] The X-Rays were also compared to Plaintiff's X-Ray dated August 7, 2018. At her follow-up appointment, Plaintiff stated that she felt her pain had somewhat improved and that there was no longer sharp shooting pain down the leg.[20] Plaintiff also noted that she had throbbing pain to the right calf and numbness in her right foot. Dr. Andrade noted that Plaintiff could gradually resume normal activities as tolerated.

Plaintiff returned to the Douglas Clinic on November 13, 2018, and was seen by Melissa Whitus, FNP-C. Plaintiff presented with complaints of a persistent cough, nasal congestion, headache, sore throat, and fatigue. Plaintiff also complained of sinus pain and pressure as well as teeth pain, and stated she had been using cough syrup and Tylenol without relief. A review of Plaintiff's symptoms was negative for musculoskeletal pain and the physical exam revealed normal range of motion without edema, along with a normal mood and affect. FNP-C Whitus

---

[17] Bates stamp p. 1668.
[18] Bates stamp p. 1716.
[19] Bates stamp p. 1728.
[20] Bates stamp p. 566.

diagnosed Plaintiff with acute frontal sinusitis, bilateral acute serous otitis media and a cough, and gave Plaintiff a prescription for Augmentin and Phenergan-codeine. On November 30, 2018, Plaintiff returned to the Douglas Clinic complaining of EGD, worsening reflux, and abdominal pain. A review of Plaintiff's symptoms showed positive results for fatigue, postprandial epigastric pain/dyspepsia, joint pain, morning stiffness and back pain. Plaintiff was diagnosed with non-ulcer dyspepsia, gastroesophageal reflux disease without esophagitis, and chronic superficial gastritis without bleeding.[21] FNP-C McDowell gave Plaintiff a trial of FDGAR to take with each meal for several days and then to use as needed, with instructions to send a progress report via MyChart. FNP-C McDowell noted that Plaintiff may better tolerate a lower dose of imipramine and that Plaintiff could also consider HIDA scan with CCK, as a sonogram showed what appeared to be a mildly distended gallbladder (even though no stones were noted, and the gallbladder appeared normal on MRCP).[22] Dr. George Duvall had previously given Plaintiff a prescription for imipramine, but Plaintiff stated that it did not help her dyspepsia and also gave her side effects of urinary hesitancy, so she stopped taking it. Plaintiff also stated that a trial of Dicyclomine was likewise ineffective. Dr. Duvall noted that if the FDGAR trial did not provide relief, that Plaintiff should take the low dose of imipramine for 3–4 weeks at night.

On January 1, 2019, Plaintiff arrived at the Christus Mother Frances Hospital Emergency Department complaining of pelvic pain and dysuria. A physical examination performed by Dr. Shaun York was unremarkable, and Dr. York noted Plaintiff exhibited a normal mood and affect. Dr. York diagnosed Plaintiff with acute cystitis without hematuria, gave Plaintiff a prescription for Keflex with instructions to follow up with Urology, and discharged Plaintiff the next day.[23] On

---

[21] Bates stamp p. 612.
[22] Summary Bates stamp p. 334–35.
[23] Bates stamp p. 1953.

January 11, 2019, Plaintiff again presented at Christus Trinity Mother Francis Hospital Emergency Room, complaining of abdominal pain, diarrhea, nausea, vomiting, and fever. Upon examination by Dr. Addison Whetstone, Plaintiff had normal range of motion, reflexes, muscle tone and coordination and no edema. Plaintiff also exhibited a normal mood and affect and behavior. Dr. Whetstone ordered labs, a CT of the abdomen and pelvis without contrast, and a chest X-Ray. Dr. Whetstone compared Plaintiff's CT with the Gastric Emptying Study from October 16, 2018, and noted no acute findings in the abdomen or pelvis. The CT revealed Plaintiff's transplant kidney was without hydronephrosis or obstructive uropathy and revealed that Plaintiff's native kidney showed severe atrophy. Dr. Whetstone noted that the CT also showed Colon diverticulosis without diverticulitis, and that the findings were suggestive of constipation. Plaintiff's X-Ray revealed no acute findings, but did show a right midlung nodular density (9 mm) or bone island. Dr. Whetstone informed Plaintiff of the lung nodule and diagnosed Plaintiff with unspecified abdominal pain, nausea, vomiting, diarrhea, and fever. Plaintiff was discharged the following day with prescriptions for dicyclomine, ondansetron, and promethazine. Plaintiff was instructed to follow up with Dr. Roy Gerard in Nephrology and Dr. Stanford after 48 hours.[24]

On January 16, 2019, the Disability Determination Services referred Plaintiff to Psychologist Dr. Suzanne Chapman Reams, for a psychological consultive examination.[25] The report reflects that Plaintiff's chief complaints were difficulty sitting or standing, stomach issues due to medication causing diarrhea and bloating, and problems with depression and anxiety. Dr. Reams reviewed Plaintiff's history of present illness and noted that Plaintiff took over twenty prescription medications. Plaintiff was responsive and cooperative during examination and her interaction with the examiner was appropriate. Plaintiff showed no evidence of thought disorder

---

[24] Bates stamp p. 673–98.
[25] Administrative Record, Ex. 7F, Bates stamp p. 711.

and thought processes were rational and goal oriented. Plaintiff appropriately used generalizations and abstractions. Her thought content appeared congruent to her mood and circumstances with normal and logical thought organization. Plaintiff acknowledged suicidal ideation but said "[she] would never do it."[26] Plaintiff denied delusions or obsessions and her affect was flat and her mood was depressed. Plaintiff did not appear confused and was oriented to person, time, situation, and object. Plaintiff was aware of current events, and her remote memory was judged to be adequate. Plaintiff had some difficulty with repetition of seven numbers forward and seven numbers in reverse. Plaintiff's concentration appeared to be intact because she could subtract 7s from 100 and 3s from 20. She was also able to count backwards from 20 to 1 perfectly and correctly alternate between letters and numbers for 10 out of 10 series. She was able to generate a list of 15 items, which could be purchased at the grocery store, with only one repeated item. Plaintiff's judgment for hypothetical situations was adequate and her insight appeared intact. No psychological tests were administered.

Dr. Reams diagnosed somatic symptom disorder, with predominate pain, persistent, severe, and Major Depressive Disorder, recurrent, severe, with anxious distress, severe. She opined that Plaintiff's prognosis was extremely guarded and stated that "due to her numerous medical problems and her severe depression, she would have difficulty sustaining meaningful employment." Administrative Record, at *5 (Bates stamp p. 715). She stated that Plaintiff suffered from anhedonia, poor sleep, lack of appetite, and is easily distracted. She further stated that things have gotten worse over the last year, that Plaintiff socially isolates, and that Plaintiff would benefit from therapy.

---

[26] Bates stamp p. 715.

On April 12, 2019, Plaintiff presented to the Douglas clinic complaining of pain in her left calf that was accompanied by intermittent "electricity shock-like symptoms in her left shin."[27] Plaintiff also requested an abdominal exam to address a possible hernia, stating that she felt stretching in her left lower quadrant with sneezing or any pressure. Upon examination, Melissa Whitus, FNP-C observed what she thought was a 0.5 cm hernia in Plaintiff's LLQ abdomen. Plaintiff's musculoskeletal exam revealed no edema or tenderness, and FNP-C Whitus noted that Plaintiff had a normal mood and affect. The record also reflects Plaintiff's Depression Screening showed a PHQ2 Total Score of 4 and a PHQ9 Total Score of 16. FNP-C Whitus noted they would continue to monitor the small hernia, ordered an EMG LLE, and started Plaintiff on gabapentin.[28]

On March 31, 2019, Plaintiff presented at the Trinity Clinic Ornelas Health Park complaining of constant pain in her left ear which had been rapidly worsening in severity to a 6/10. A review of Plaintiff's symptoms included positive showings of rhinorrhea and environmental allergies. Misty Houston, FNP-C preformed a physical examination which showed Plaintiff had a normal range of motion and noted that Plaintiff had a normal mood and affect. Plaintiff was diagnosed with acute suppurative otitis media of the left ear without spontaneous rupture of the tympanic membrane, given a prescription for amoxicillin, and was instructed to follow up with her primary care physician if her symptoms did not improve.

Plaintiff had a follow up with Dr. Berkson on April 16, 2019, and presented with complaints of predominantly left lumbar pain with radiation into the left lower extremity. Plaintiff stated that she had noticed improvement post her right L5-S1 hemilaminectomy and microdiscectomy with Dr. Andrade on October 26, 2018, but reported that her current pain had been progressing over the last two to three months. Plaintiff stated that the pain was insidious in

---

[27] Bates stamp p. 846.
[28] Bates stamp p. 725.

onset and described the pain as sore or bruised. Plaintiff stated the pain is worst while sitting, transition from sit to stand, or getting in and out of the car. Plaintiff reported some relief with medications, lying supine, as well as changes with heat and cold. Dr. Berkson reviewed Plaintiff's MRI from December 14, 2018, and overall concurred with the radiologist's assessment. Dr. Berkson noted facet arthropathy at L2-3, L3-4, and L4-5, and an annular tear along with facet arthropathy at L5-S1. The record also reflects that Dr. Berkson questioned whether "there is potential mild contact of the left L4 nerve root very far laterally in the neural foramen, which is best seen in T1 axial imaging; Image 19, Series 8."[29] A physical examination showed positive results for PSP TTP Right, Facet Loading Maneuver, and Slump on Plaintiff's Right L-Spine and Left L-Spine Extension. Dr. Berkson noted that he may consider the possibility of facet injections pending the findings from Plaintiff's upcoming EMG electrodiagnostic studies with Dr. Merrit. Plaintiff also stated that Dr. Andrade had "obtained updated imaging which did not demonstrate any evidence of overt neural contact."[30]

On July 9, 2019, Plaintiff presented at Christus Trinity Mother Frances Healthpark and established care with Andrew O'Kelley.[31] Plaintiff presented complaining of stomach pain that occurred 2-3 times per week, elevated blood sugars, and reactive depression following the death of her son who had passed away in January. A review of Plaintiff's symptoms showed positive results for depressed mood. Her physical examination showed no abnormalities. Dr. O'Kelley gave Plaintiff referrals to Gastroenterology for colon and breast cancer screenings and a prescription for Prozac for her reactive depression. The record reflects that Dr. O'Kelley also addressed Plaintiff's elevated triglyceride and A1C levels and recommended that she recheck the A1C in three months

---

[29] Bates stamp p. 859.
[30] Bates stamp p. 860.
[31] Bates stamp p. 2439.

to see if she could improve it with lifestyle changes alone. On September 3, 2019, Plaintiff had a follow up visit with Dr. O'Kelley and presented with complaints of dizziness related to low blood pressure.[32] Plaintiff stated that the dizziness was somewhat alleviated after she decreased her dosage of Norvasc from 10mg to 2.5mg per day. Dr. O'Kelley approved a trial stoppage of Norvasc and gave Plaintiff a prescription for Trulicity. Plaintiff subsequently notified Dr. O'Kelley that she was unable to take Trulicity due to concerns related to her transplant kidney, and that she restarted Norvasc after her blood pressure elevated and that Prozac was working well for her.[33] On November 11, 2019, Plaintiff had another follow up with Dr. O'Kelley complaining of pain in her left arm, left ear, hernia, painful knot on toe, and daily morning vomiting. Plaintiff stated that her arm pain started in her shoulder, radiated down toward the ulnar side of her arm, and that Tylenol and muscle relaxers had not helped. Plaintiff also complained of hernia pain associated with sneezing or coughing. A physical examination revealed a positive Spurling test[34] and Dr. O'Kelley ordered an MRI of Plaintiff's cervical spine and gave Plaintiff a referral to general surgery to address her hernia.

On December 12, 2019, Plaintiff returned to the Christus Trinity Pain Medicine Clinic for a follow up with Dr. Dunn, and presented with failed back syndrome and chronic pain syndrome.[35] A physical examination showed neck pain with right lateral rotation and some tenderness palpation over the left cervical paraspinous musculature and upper trapezii, and showed back pain elicited with forward flexion and rotation to the left with tenderness palpation over the right bilateral lumbosacral paraspinous musculature. The record reflects Dr. Dunn thought Plaintiff's symptoms were attributable to her annular tears and that he recommended intradiscal, DVD, and SCS

---

[32] Bates stamp p. 2487.
[33] Bates stamp p. 2513.
[34] Bates stamp p. 2526.
[35] Bates stamp p. 2242.

therapies. Plaintiff stated that, given the lack of FDA approval and her kidney transplant status, she did not wish to proceed with the intradiscal option, but would consider the others.

On January 8, 2020, Plaintiff returned to the Douglas Clinic to establish care with Dr. Ellen Walraven.[36] Plaintiff presented with complaints of obstructive sleep apnea, depression, ventral hernia, and back pain. A physical examination confirmed Plaintiff's ventral area hernia but revealed no other abnormalities. Dr. Walraven ordered lab work and gave plaintiff a referral for a sleep medicine consultation. The results from Plaintiff's sleep study revealed evidence of mild obstructive sleep apnea with an AHI of 7.3/hour and oxygen desaturation to a low of 85%. Plaintiff was advised to begin a trial with a CPAP. On January 14, 2020, Plaintiff presented at Christus Trinity Clinic General Surgery for a surgical opinion and consultation with Dr. Robert McKinney regarding the possible hernia in Plaintiff's lower left quadrant. Plaintiff stated that she felt a "tearing" discomfort and that she could feel a small mass-effect in the area. A physical exam revealed a suspected spigelian hernia, although Dr. McKinney noted that the CT scan of the abdomen and pelvis from the previous year did not identify any specific abdominal wall abnormalities. Dr. McKinney ordered a repeat abdominal CT which showed no hernia present.[37]

Between March 8, 2016—February 9, 2020, Plaintiff saw Dr. Roy Gerard at The Centers for Kidney Care on separate occasions approximately six months a part, for follow-up care after her March 2011 kidney transplant. At each visit, Dr. Gerard spoke with Plaintiff regarding her overall health and performed a physical examination. Dr. Gerard's notes from each visit reflect that Plaintiff exhibited a normal mood, and the record from the March 8, 2016, visit specifically notes that Plaintiff "d[oes] not have any problems with depression, anxiety, or insomnia and had a

---

[36] Bates stamp p. 2316.
[37] Bates stamp p. 2397.

normal mood."[38] During her visit on May 23, 2019, Dr. Gerard noted that Plaintiff had a variety of issues that were interfering with her daily life and ability to maintain employment, but opined that Plaintiff's symptoms were likely magnified by her grief associated with the death of her son.[39] Likewise, on February 9, 2020, Plaintiff had a follow up appointment with Dr. Gerard regarding her transplant kidney. Plaintiff stated she had occasional back pain with sciatica and complained of depression and insomnia. A physical examination was unremarkable, and Dr. Gerard noted that Plaintiff was "still mourning for her dead son," but appeared to be "much more calm and appropriate" than she was during their last visit.[40]

The record reflects that between April 24, 2019–October 28, 2019, Plaintiff presented at Tapestry Counseling for twelve appointments with Howard Brent Kirkley.[41] At each appointment, Plaintiff's chief complaints were grief related to the death of one of her sons and her on-going physical pain. During her appointment on August 26, 2019, Plaintiff stated that she was taking her depression medication and reported feeling much better.[42] At her appointment on October 28, 2019, Plaintiff stated that she felt that she was doing well and expressed that she would like to consider discontinuing therapy after Thanksgiving; Plaintiff was a no show for the appointment scheduled for December 2, 2019.

Dr. Michelle Chappuis, Ph.D., and Dr. Blaine Carr, Ph.D., reviewed the medical record and completed a mental RFC assessment on February 20, 2019 and May 22, 2019, respectively. Both doctors concluded that Plaintiff's mental impairments cause no more than "mild" limitations in any of the paragraph B criteria and are non-severe.[43]

---

[38] Bates stamp p. 327.
[39] Bates stamp p. 2604.
[40] Bates stamp p. 2590
[41] Bates stamp p. 2235.
[42] Bates stamp p. 85.
[43] Bates stamp p. 127, 139.

### DISCUSSION AND ANALYSIS

In her brief, Plaintiff identifies one issue for review—whether the ALJ's mental residual functional capacity ("RFC") determination is supported by substantial evidence. Specifically, Plaintiff argues that the ALJ failed to consider Dr. Reams's opinion in accordance with the proper legal standards.

When determining that Dr. Reams's opinion is unpersuasive, Plaintiff asserts that the ALJ gave improper reasons for discounting Dr. Reams's opinion, and more specifically that the ALJ appears to disregard the diagnosed symptomology throughout the remainder of his analysis. Plaintiff next asserts that the ALJ improperly discounted Dr. Reams's opinion by using the fact that Plaintiff had not sought mental health treatment and does not take psychiatric medications. Plaintiff submits that she informed Dr. Reams that she cannot take psychiatric medications due to the side effects. Finally, Plaintiff asserts that the ALJ mischaracterized several medical visits that noted Plaintiff's mental health as normal, and argues that they are incomparable with Dr. Reams's opinion because the providers were not mental health specialists, and the appointments were for her unrelated physical impairments. Thus, Plaintiff argues that there is not substantial evidence to support the ALJ's finding that no mental limitations were warranted in the RFC.

In response, the Commissioner contends that the ALJ properly evaluated Dr. Reams's opinion. Applying the revised regulations for evaluating medical evidence, the ALJ evaluated Dr. Reams's opinion and considered its supportability and consistency with the overall medical evidence of record. The ALJ referenced Dr. Reams's Report and noted that "except for rapid speech, labile/flat affect, and depressed mood, the CE's mental status examination was essentially

normal." Administrative Record, ECF 13-2 at *17 (Bates stamp p. 16). Specifically, the ALJ referenced Plaintiff's presentation and behavior during Dr. Reams's examination including Plaintiff's ability to concentrate, socialize, and manage herself, and found that the evidence contradicted Dr. Reams's opinion that Plaintiff would have difficulty sustaining employment. The Commissioner further asserts that the ALJ properly considered Dr. Reams's diagnosis that Plaintiff suffers from "Major Depressive Disorder, recurrent, severe, with anxious distress, severe," but submits that "a diagnosis is not, itself a functional limitation." Comm'r Brief, Doc. No. 17 at 10 (citing *Dise v. Colvin*, 630 F. App'x 322, 326 (5th Cir. 2015)). The ALJ noted specific entries in the medical record that he determined were inconsistent with Dr. Reams's findings, including Plaintiff's admission that she was not taking psychiatric medication despite her willingness to take other medications that allegedly caused significant side effects, as well as citing several normal psychological findings on examination, and ultimately concluded Dr. Reams's opinion is unpersuasive. The Commissioner submits that the ALJ's RFC finding is supported by substantial evidence.

It is the ALJ's responsibility to determine a claimant's residual functional capacity. *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995). That finding, however, must be supported by substantial evidence. *Id*. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Newton v. Apfel*, 209 F.3d at 452. On review, the Court will scrutinize the record to determine whether substantial evidence is present to support the ALJ's finding, but the Court cannot reweigh the evidence or substitute its judgment. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). "If the Commissioner's fact findings are supported by substantial evidence, they are conclusive." *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005) (citing *Richardson v. Perales*, 402 U.S. 389, 390, 91 S.Ct. 1420 (1971)).

The revised rules for the consideration and articulation of medical opinions apply to claims filed after March 27, 2017. 20 C.F.R. § 404.1520c. Plaintiff filed her application on October 15, 2018. Pursuant to 20 C.F.R. § 404.1520c(a), the Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." The ALJ evaluates the persuasiveness of the medical opinions and articulates the consideration of medical opinions, but the ALJ is not required to explain the consideration of each factor that is considered. 20 C.F.R. § 404.1520c(b). The "supportability" and "consistency" factors are most important. *Id*.

In his written decision, the ALJ addressed the opinions of Dr. Reams and the State agency medical consultants. The ALJ noted Dr. Reams's opinion that Plaintiff would have difficulty in sustaining meaningful employment and that Plaintiff's prognosis was extremely guarded due to her numerous medical problems and her severe depression. The ALJ then stated:

> I find Dr. Reams' opinions unpersuasive because whether or not the claimant can work is an issue reserved to the Commissioner. Additionally, Dr. Reams' opinion is not consistent with or supported by her own mental status exam of the claimant, which was essentially normal except for rapid speech, labile and flat affect, and depressed mood (7F/3-4). Her opinions are also inconsistent with the fact that the claimant has not received any mental health treatment up to this point and was not taking any psychiatric medications.

Administrative Record, ECF 13-2, at *17 (Bates stamp p. 16). Conversely, the ALJ concluded that the administrative medical findings that Plaintiff's mental impairments caused no more than "mild" limitations in any of the paragraph B criteria and were nonsevere, were persuasive. The ALJ explained that the opinions of the State agency psychological consultants "are consistent with and supported by the essentially normal mental status exam by Dr. Reams, and her normal mental status exams by her treating providers." *Id* at *18 (Bates stamp p. 17).

Before addressing the persuasiveness of the medical opinions and prior administrative findings, the ALJ summarized the treatment records and Plaintiff's subjective statements concerning her impairments and functional abilities. The ALJ's summary includes treatment notes documenting anxiety and depression, trouble sleeping, and difficulty with concentration, as well as notes from appointments when Plaintiff exhibited normal mood and affect, normal speech and behavior, and normal judgment and thought content. The ALJ noted that Plaintiff has been prescribed Prozac for depression and pointed out that she reported not taking any psychiatric medication. He also noted that Plaintiff had a demonstrated ability to perform tasks such as personal grooming, cooking, grocery shopping, driving, and paying bills, as well as receiving support from her children and mother.

Plaintiff alleges that the ALJ failed to consider Dr. Reams's diagnosis as evidence that supports her alleged functional limitations. The ALJ stated that he found Dr. Reams's opinion unpersuasive and specifically referenced Plaintiff's lack of mental health treatment and refusal to take psychiatric medications as inconsistencies. Administrative Record, ECF 13-2, at *17 (Bates stamp p. 16). The ALJ noted that Plaintiff went to Tapestry Counseling in April 2019 for grief related to the death of her 28-year-old son. He noted that the record only shows she attended one session in April 2019 and one session in May 2019, in conflict with Plaintiff's testimony that she attended multiple sessions. The ALJ also pointed out that the progress notes did not include any objective mental status exam findings. The ALJ further stated that Plaintiff's mental status exams have been normal since being evaluated by Dr. Reams, and cited three examples from July 2019, October 2019, and January 2020.

Although Plaintiff's counsel submitted additional documentation which demonstrates that Plaintiff attended twelve sessions at Tapestry Counseling, Administrative Record, ECF 13-4, at

*29–43 (Bates stamp p. 75–89), those progress reports were not in the record for the ALJ to review. Moreover, the notes from the additional sessions do not contradict the ALJ's RFC determination but serve as additional examples to show that it is supported by substantial evidence. For example, at Plaintiff's session on July 22, 2019, the record reflects that Plaintiff reported that her doctor had put her on a low dose of Prozac and that Plaintiff "appeared more alert and smiled more often." Administrative Record, ECF 13-4, at *14 (Bates stamp p. 82). Likewise, the record from each subsequent session reflects that Plaintiff reported feeling better emotionally and was continuing to take her depression medication. Administrative Record, ECF 13-4, at *14 (Bates stamp p. 82–88). Thus, the record shows that the ALJ reviewed the entire record and properly considered the consistency and supportability of Dr. Reams's opinion.

The ALJ addressed both the supportability and consistency of each medical opinion and identified specific medical evidence to support his conclusions. Plaintiff has not shown that the ALJ failed to properly consider the opinion of Dr. Reams in compliance with the revised regulations and his finding is supported by substantial evidence. Accordingly, the Commissioner's decision should be affirmed, and the complaint should be dismissed.

## RECOMMENDATION

It is hereby **RECOMMENDED** that the Commissioner's final decision be **AFFIRMED,** and that this social security action be **DISMISSED WITH PREJUDICE**.

Within fourteen days after receipt of the Magistrate Judge's report, any party may serve and file written objections to the findings and recommendations of the Magistrate Judge. 28 U.S.C. § 636(b). A party's failure to file written objections to the findings, conclusions, and recommendations contained in this Report within fourteen days after service shall bar that party from de novo review by the District Judge of those findings, conclusions, and recommendations,

and except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United Services Auto. Assn.,* 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

So ORDERED and SIGNED this 15th day of August, 2022.

_____
K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE